UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
SUSAN LAFERRERA O/B/O M.J.S.,

                    Plaintiff,

          - against -

COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.
------------------------------------------------------x

**MEMORANDUM & ORDER**
15-CV-1735 (PKC)

PAMELA K. CHEN, United States District Judge:

       Plaintiff Susan LaFerrera ("LaFerrera" or "Plaintiff") brings this action on behalf of her minor son, M.J.S. ("M.J.S." or "Claimant"), under 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the February 4, 2013 determination of the Commissioner of Social Security (the "Commissioner") that M.J.S. is not entitled to Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act ("SSA"). The parties have cross-moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). The Commissioner seeks to have the Court affirm the Commissioner's disability determination. Plaintiff seeks reversal of the Commissioner's decision and requests a remand solely for the purpose of approval and calculation of SSI benefits.

       For the reasons set forth below, Defendant's motion is DENIED, and Plaintiff's motion is GRANTED in part and DENIED in part. The Court reverses the Commissioner's decision and remands M.J.S.'s claim to the Commissioner for further proceedings consistent with this Order.

# BACKGROUND

## I.   *Procedural History*

On July 27, 2011, Plaintiff, M.J.S.'s mother, applied for SSI benefits on behalf of M.J.S., alleging that her son had been disabled since birth[1] due to asthma, Crohn's disease (chronic inflammation of the colon),[2] colitis,[3] Gastroesophageal Reflux Disease ("GERD"), severe food allergies, and irritable bowel disease. (Tr. 142, 178-87, 204, 259.)[4] On October 5, 2011, the claim was denied. (Tr. 143-48.) On November 29, 2011, Plaintiff requested a hearing before an ALJ, and on December 3, 2012, ALJ James Kearns presided over a hearing, in which Plaintiff testified. (Tr. 160, 76-88.) The ALJ issued a written decision on February 4, 2013, concluding that M.J.S. was not disabled and therefore not entitled to SSI benefits. (Tr. 54-75.) The ALJ's decision

---

[1] SSI benefits are not payable for any month prior to the month in which an application is filed. 20 C.F.R. § 416.335; *see also Bussi v. Barnhart*, No. 01 Civ. 4330, 2003 WL 21283448, at *1 n.1 (S.D.N.Y. Jun. 3, 2003) (noting that for the purposes of an SSI claim, the Social Security Administration need only determine whether the claimant was eligible beginning at the time of filing).

[2] "Crohn's disease is defined as a synonym of 'regional enteritis,' which is in turn defined as 'a subacute chronic [enteritis] of unknown cause, involving the terminal ileum and less frequently other parts of the gastrointestinal track.'" *Verna v. Comm'r of Soc. Sec.*, No. 11 Civ. 7947, 2013 WL 563370, at *2 n.2 (S.D.N.Y. Feb. 15, 2013) (citing *Stedman's Medical Dictionary* 512, 597 (27th ed. 2000)).

[3] Plaintiff listed non-specific colitis, enterocolitis, and ulcerative colitis in documents she filed with the SSA. (*See, e.g.,* Tr. 259.)

Ulcerative colitis "is an inflammatory bowel disease (IBD) that causes long-lasting inflammation and ulcers (sores) in your digestive tract. Ulcerative colitis affects the innermost lining of your large intestine (colon) and rectum. . . . Ulcerative colitis can be debilitating and sometimes can lead to life-threatening complications. While it has no known cure, treatment can greatly reduce signs and symptoms of the disease and even bring about long-term remission." *See* http://www.mayoclinic.org/diseases-conditions/ulcerative-colitis/basics/definition/con-20043 763 (Last visited 3/23/2017).

[4] All references to "Tr." refer to the consecutively paginated Administrative Transcript.

became the final decision of the Commissioner on January 28, 2015, when the Appeals Council of

the Office of Disability Adjudication and Review denied Plaintiff's request for review of the ALJ's

decision. (Tr. 1-6.) Plaintiff timely commenced this action on April 1, 2015, and cross-motions

for judgment on the pleading were fully briefed on January 29, 2016.

## II.     *Nonmedical Evidence*

Claimant M.J.S. is a male child, born on June 27, 2005. (Tr. 80.) At the time Plaintiff filed

for SSI benefits, M.J.S lived with his mother and his sibling (Tr. 80) and was in first grade at PS

29, a public school in Staten Island, New York. (Tr. 207.)

As part of M.J.S.'s SSI benefits application, Plaintiff completed a Function Report (Tr.

193-202), a Disability Report (Tr. 207), and an asthma questionnaire (Tr. 220-22) on behalf of

M.J.S. Plaintiff also submitted documentation from a school accommodation request for M.J.S.

for the 2011-2013 school years. (Tr. 210-11, 218, 323, 636, 638-39.)

### A.     **Disability and Function Reports and Plaintiff's Testimony**

In an August 12, 2011 Disability Report, Plaintiff reported that M.J.S. was taking

medications for asthma, colitis, allergies, and GERD. (Tr. 206.) Specifically, M.J.S. was taking

Albuterol, Flonase, Flovent, and Singulair for his asthma; Colazol for colitis; an Epi-Pen for

allergies; and Nexium for acid reflux. (*Id.*) Plaintiff also reported that M.J.S. primarily relies on

Pediatric EO 28, a special formula, for his nutrition. (*Id.*)

In an August 12, 2011 Function Report, Plaintiff reported that M.J.S.'s medical conditions

affect his ability to take care of personal needs and that he is unable to tie his shoelaces, take a bath

or shower without help, wash his hair by himself, hang up clothing, or obey safety rules. (Tr. 200.)

The report noted, however, that M.J.S. was able to use zippers, button clothes, brush his teeth,

comb his hair, choose clothes, use utensils, put away toys, help around the house, generally follow

instructions, get to school on time, and accept criticism. (Tr. 200.) Plaintiff also indicated that M.J.S.'s physical abilities were not limited. (Tr. 198.)

In a November 29, 2011 Disability Report, Plaintiff reported that M.J.S.'s condition had worsened since she had previously submitted the initial Disability Report on August 12, 2011; specifically, Plaintiff noted that M.J.S. was experiencing blood in his stool after eating solid foods. (Tr. 229.) The new Disability Report noted that M.J.S. had difficulty caring for his personal needs and that someone had to be with him at all times at school "because he needs to be rushed to the bathroom." (Tr. 233.)

At the December 3, 2012 hearing before the ALJ, Plaintiff was the only one who testified. (Tr. 76-88.) M.J.S. was present at the hearing. (Tr. 76.) Plaintiff testified that when M.J.S. was born, he had lung problems which required CPAP[5] and was in the NICU[6]. (Tr. 86.) She testified that by the time M.J.S. was 13 months old, he was diagnosed with Crohn's disease, irritable bowel, and asthma. (Tr. 80.) She identified Dr. Eberhardt as M.J.S.'s primary doctor, Dr. Spergel as his allergist, and Dr. Ritu Verma as his gastroenterologist. (Tr. 83-84). Noting M.J.S.'s other conditions such as acid reflux, multiple food allergies, nonspecific colitis, enterocolitis,[7] and eosinophilic esophagitis,[8] Plaintiff explained that, because all of M.J.S.'s conditions are closely

---

[5] CPAP is a technique of respiratory therapy, in either spontaneously breathing or mechanically ventilated patients, in which airway pressure is maintained above atmospheric pressure throughout the respiratory cycle by pressurization of the ventilator circuit. *See Stedmans Medical Dictionary* ("*Stedman's*") at 719700.

[6] Neonatal Intensive Care Unit is a special area of the hospital into which newborns who need intensive medical attention are admitted. *See* http://www.stanfordchildrens.org/ en/topic/default?id=the-neonatal-intensive-care-unit-nicu-90-P02389 (Last visited 3/24/2017.)

[7] Enterocolitis is a condition where there is inflammation of the mucous membrane of a greater or lesser extent of both small and large intestines. *Stedman's* at 294020.

[8] "In eosinophilic esophagitis, a type of white blood cell (eosinophil) builds up in the lining of the tube that connects your mouth to your stomach (esophagus). This buildup which is a reaction

related, it has been difficult to figure out whether M.J.S.'s symptoms were caused by allergens or by his intestinal disease. (Tr. 81.) She testified that diagnoses had been "going up and down, and all over the place." (*Id.*) She explained that M.J.S. has an endoscopy, colonoscopy, and scoping every six months at the Children's Hospital of Philadelphia ("CHOP") and that he once experienced complications during a procedure. (Tr. 82.) When the ALJ asked if M.J.S.'s colitis was currently active or in remission, Plaintiff testified that M.J.S. can "stay stabilized for a good period of time"—that is five to seven days—depending on what M.J.S. eats. (Tr. 85.) She testified that M.J.S. suffered an "attack" at least once a week due to his gastro-intestinal conditions. (Tr. 85.) She said that on some days, M.J.S. would have severe bloody stools and then be "just fine" on other days. (Tr. 86.) Still, M.J.S. complains of stomach pain on a daily basis. (*Id.*)

When the ALJ further asked about how M.J.S.'s conditions affect him, Plaintiff testified that he cannot go out and play like other children (Tr. 86), and that he is constantly under supervision by a paraprofessional at school due to his severe allergies. (Tr. 86, 87.) She recalled an incident where M.J.S. went into an asthmatic attack at school after someone had sprayed Febreze on a carpet. (Tr. 86.) When asked by the ALJ if M.J.S. had any developmental problems, Plaintiff responded: "He's been pretty much on track with school, and growth patterns." (Tr. 81.) No one else testified at the hearing. (Tr. 78-88.)

### B.    Asthma Questionnaire

Plaintiff also completed an asthma questionnaire as part of the SSI benefits application. (Tr. 220-22.) She stated that M.J.S. was taking Flovent, Flonase, Singulair, Albuterol, and

---

to foods, allergens or acid reflux, can inflame or injure the esophageal tissue. Damaged esophageal tissue can lead to difficulty swallowing or cause food to get caught when you swallow." http://www.mayoclinic.org/diseases-conditions/eosinophilic-esophagitis/basics/definition/con-20035681 (Last visited 3/23/2017).

Xopanek for asthma until August 26, 2011, but that the doctor had prescribed a new set of medication (Advair, Flonase, Patanol, and an Epi-Pen) due to non-improvement. (Tr. 220.) Plaintiff noted that M.J.S. had multiple breathing issues and asthma attacks "per week and per month," and that M.J.S.'s ability to breathe is affected daily by movement, running, air temperature and quality, and food allergies. (Tr. 220.)

### C. School Records

Plaintiff had requested school accommodations for M.J.S. for the 2011-2013 school terms. (Tr. 210-11, 218, 323, 636–39.) Plaintiff requested, *inter alia*, that an aide or paraprofessional be present at school for all of M.J.S.'s food, cafeteria, and snack time to help him avoid food allergies. (Tr. 210, 323, 636, 638.) Plaintiff also requested that the school provide a paraprofessional who can recognize symptoms of allergy, and asthma and help M.J.S. with colitis flares. (Tr. 210-11, 323, 636.)

In two School Asthma Questionnaires, dated August 1, 2011 and June 26, 2012, Plaintiff noted that M.J.S. was diagnosed with asthma in 2008. (Tr. 217, 258.) She listed the following triggers in the questionnaire: change in temperature, animals, colds, smoke, exercise, and dust. (Tr. 217, 258.)

### III. *Medical Evidence*

### A. Treatment for GERD and Crohn's Disease

M.J.S. has been a patient at CHOP since 2006 (*i.e.*, since he was 14-months old) for his multiple medical conditions. (Tr. 650, 314.) Dr. Ritu Verma, a gastroenterologist at CHOP treated M.J.S. on June 2, 2010 (Tr. 314-15), November 13, 2010 (Tr. 310-12), and February 2, 2012 (Tr. 306-07). On June 2, 2010, Dr. Verma noted that M.J.S.'s rectal bleeding was not improving and that a colonoscopy was needed. (Tr. 314.) She listed M.J.S.'s medications as Nexium, an Epi-Pen, Flonase, Floven, Colazal, an albuterol inhaler, Singulaire, and Benadryl. (Tr. 306-07, 310,

314.)  M.J.S. underwent an esophagogastroduodenoscopy ("EGD")[9] and a colonoscopy yearly

from 2007 to 2011.  (Tr. 355-574.)  M.J.S. complained of blood in his stools and vomiting.  (Tr.

364, 422.)  The 2007 endoscopy showed "marked focal erythema,"[10] in the stomach which the

physician suspected may have been caused by vomiting.  (Tr. 374.)  The duodenum and esophagus

appeared normal.  (*Id.*)  The 2007 colonoscopy revealed an anal fissure[11] and presence of nodular

tissue (known as lymphonodular hyperplasia)[12] of the ascending colon,[13] but there were no masses

or polyps.[14]  (Tr. 376.)  Biopsies from 2007 revealed some evidence of ileitis[15].  (Tr. 381.)  The

2008 EGD was normal (Tr. 415), but the 2008 colonoscopy revealed mild friability[16] of the colon

---

[9] Esophagogastroduodenoscopy ("EGD") is an endoscopic examination of the esophagus, stomach, and duodenum usually performed using a fiberoptic instrument.  *Stedman's* at 304300.

[10] Erythema is redness due to capillary dilation, usually signaling a pathologic condition (*e.g.*, inflammation, infection).  *Stedman's* at 302460.

[11] Anal fissure is a crack or slit in the mucuous membrane of the anus, very painful and difficult to heal.  *Stedman's* at 335230.

[12] "Lymphonodular hyperplasia (LNH) stands for a pronounced reactive enlargement of mucosal lymphoid nodules in the gastrointestinal (GI) tract. Diagnosis is based on endoscopic or radiological detection of typical nodularity of the mucosa and on exclusion of other conditions causing such mucosal nodules."  *See* https://link.springer.com/chapter/10.1007%2F978-3-319-17169-2_32 (Last visited 3/28/2017.)

[13] Ascending colon is the portion of the colon between the ileocecal orfice and the right colic flexure.  *Stedman's* at 190080.

[14] Polyp is a general descriptive term used with reference to any mass of tissue that bulges or projects outward or upward from the normal surface level, thereby being macroscopically visible as a hemispheroidal, spheroidal, or irregular moundlike structure growing from a relatively broad base or a slender stalk; polyps may be neoplasms, foci of inflammation, degenerative lesions, or malformations.  *Stedman's* at 709970.

[15] Ileitis is an inflammation of the ileum.  *Stedman's* at 434420

[16] Friable means easily reduced to powder. *Stedman's* at 355610. "The diagnosis of ulcerative colitis is established by finding characteristic intestinal ulcerations and excluding alternative diagnose . . . . Patients with severely active disease can have . . . deep ulcers and

(Tr. 414). The 2008 biopsies indicated inflammatory reaction in the esophagus and superficial candida[17] fungal strains in the esophagus. (Tr. 417-18.) The 2009 EGD indicated friable mucosa and erythematous mucosa in the duodenum[18] but normal esophagus and stomach. (Tr. 454.) The 2009 biopsies indicated esophagitis.[19] (Tr. 457.) The 2010 colonoscopy, EGD, and biopsies were normal. (Tr. 493-94, 500.) According to the administrative record, the 2011 colonoscopy and EGD were also normal. (Tr. 526.) However, immediately after the apparently "normal" 2011 colonoscopy and EGD, M.J.S. experienced post-operative vomiting and diarrhea with "brownish green with 'fleshy pieces' and bright red blood." (Tr. 518-21.) The 2011 biopsies indicated small bowel mucosa with no active inflammation.[20] (Tr. 550-51.) Medical records related to the 2011 colonoscopy and EGD indicate that M.J.S. had been diagnosed with Crohn's disease.[21] (Tr. 519, 523, 528.)

---

friability that results in spontaneous bleeding." *See* http://www. clevelandclinicmed.com /medicalpubs/diseasemanagement/gastroenterology/ulcerative-colitis/ (Last visited 3/28/2017.)

[17] Candida is a genus of yeastlike fungi. *Stedman's* at 138670.

[18] "The stomach wall is composed of four layers. The inner lining (mucosa) consists of milliions of microscopic gland which secrete gastric jucies." *See* http://www. ddc.musc.edu/public/organs/stomach- duodenum.html. (Last visited 3/28/2017.) "The first part of the small intestine is known as the duodenum." *Id.* Erythematous mucosa in the duodenum means that the EGD revealed red, irritated lining of the duodenum. *See id.*; *see also Stedman's* at 302460.

[19] Esophagitis is inflammation that may damage tissues of the esophagus, the muscular tube that delivers food from your mouth to your stomach. *See* http://www.mayoclinic.org /diseases-conditions/esophagitis/basics/definition/con-20034313 (Last visisted 3/28/2017.)

[20] According to the Discharge Summary documenting M.J.S.'s vomiting and diarrhea following his 2011 EGD and colonoscopy, the biopsy showed "only 'small bowel mucosa with prominent lymphoid tissue but no active inflammation.'" (Tr. 519.)

[21] It is not entirely clear, based on the administrative record, when exactly M.J.S. was diagnosed with Crohn's disease. Although Defendant states that M.J.S. was diagnosed with Crohn's disease in July 2011 (Dkt. 15 at 6), this appears to be an incorrect reading of the record. The July 11, 2011 Admission Note states, "Crohn's Disease Diagnosed at 13 months." (Tr. 523.)

**B. Treatment for Allergies and Asthma**

M.J.S. has been treated by Jonathan Spergel, M.D., Ph.D, an allergist at CHOP. (Tr. 650.) On August 15, 2006, M.J.S. was examined by Dr. Spergel because he was suffering from allergic reactions. (Tr. 650.) Dr. Spergel found that M.J.S. was allergic to milk, soy, chicken, rice, corn, apples, and peaches. Additionally, M.J.S. was suffering from atopic dermatitis and gastrointestinal symptoms consistent with enterocolitis. (Tr. 650-51.) Dr. Spergel recommended that M.J.S. avoid milk, soy, chicken, and rice. (Tr. 651.) He recommended that apples, peaches, eggs, and corn be worked back into M.J.S.'s diet. (*Id.*) For M.J.S.'s atopic dermatitis, Dr. Spergel prescribed a regimen of over-the-counter hydrocortisone "as needed." (*Id.*)

On September 14, 2006, M.J.S. had a second evaluation with Dr. Terri Brown-Whitehorn, an allergist. (Tr. 652.) Noting M.J.S.'s history of food protein-induced enterocolitis, vomiting, and bloody stools, Dr. Brown-Whitehorn recommended that M.J.S. avoid milk, soy, rice, chicken. and also corn, peas, and green beans. (Tr. 652-53.)

On May 16, 2008, Dr. Spergel found that M.J.S. was allergic to bee stings, and that M.J.S. was susceptible to anaphylactic shock, if stung. (Tr. 343.) Dr. Spergel reviewed with Plaintiff certain items and situations that M.J.S. should avoid: gardens, blooming plants, brightly colored clothing, and soaps with strong odors. (Tr. 343.) As for M.J.S.'s food allergy, Dr. Spergel noted that it was unclear whether M.J.S.'s reactions were to food or just part of his Crohn's disease. (Tr. 344.) In addition, Dr. Spergel found that M.J.S. suffered from "poorly controlled" and "moderate-persistent" asthma. (Tr. 345.) Dr. Spergel prescribed a regimen of Flonase, Flovent, Singulair, Ventolin HFA, Colazal, and an Epi-Pen. (Tr. 345.)

---

It appears that he had been diagnosed with Crohn's disease by May 29, 2008. (*See* Tr. 331 (Dr. Erin McGintee's notes stating that Claimant "has a history of Crohn's disease").)

On May 29, 2008, Dr. Erin McGintee examined M.J.S. and found that his asthma was "well controlled." (Tr. 331-33.) Plaintiff reported to Dr. McGintee that M.J.S.'s cough and congestion had "improved considerably" since he started taking Flovent, Flonase, and Singulair. (Tr. 331.) But, on July 30, 2010, Dr. Spergel once again found that M.J.S.'s asthma was "poorly controlled." (Tr. 334-36.) Although Dr. Spergel noted that M.J.S. had not been to the hospital or emergency room for asthma-related ailments since his last visit in 2008, he also noted that M.J.S. had suffered multiple "flares" during that time. (Tr. 334.) Moreover, Dr. Spergel noted that M.J.S. coughed and wheezed seven nights per week and had "difficulty with activity" and did not "pre-treat before exercise." (Tr. 334.) Notably, Dr. Spergel found that M.J.S. was not using an appropriate "spacer"[22] with his inhaler. (Tr. 335.) As a result, he was getting "less than 1%" of his prescribed dosage. (Tr. 335.) Dr. Spergel reviewed the proper technique for using the inhaler with Plaintiff. (Tr. 335.) M.J.S. was also suffering from "chronic nasal congestion." (Tr. 335.) Dr. Spergel noted that M.J.S.'s rectal bleeding might be more likely caused by Crohn's than food allergy. (Tr. 335.)

M.J.S. underwent a pulmonary function test at CHOP on July 30, 2010. (Tr. 340.) The report indicated "the absence of any significant degree of obstructive pulmonary impairment and/or restrictive ventilator defect." (Tr. 340.)

On August 26, 2011, during M.J.S.'s first appointment after the filing of the SSI application, Dr. Spergel noted that his allergy symptoms had increased, but were under control due to M.J.S.'s use of Flonase. (Tr. 338.) The asthma, however, was still "not well controlled." (Tr. 339). M.J.S. was coughing during "activity and playing." (Tr. 338.) Dr. Spergel noted that he was "concerned about the possibility of compliance", but did not specify what aspect of compliance he

---

[22] A device attached to a metered-dose inhaler that aids delivery of inhaled medications. *Stedman's* at 832000.

was concerned about. (Tr. 339.) He also noted that M.J.S.'s "GERD [w]as [a] co-morbid condition" and thus suspected that it may be contributing to poor control of M.J.S.'s asthma. (Tr. 339.) As for M.J.S.'s gastro-intestinal disease, Dr. Spergel noted that M.J.S. experienced bloody stool and rectal bleeding after consuming chicken, egg, soy, and milk; again, Dr. Spergel suspected that Crohn's disease, rather than food allergies, was more likely to be causing the rectal bleeding. (Tr. 339.)

The same day, M.J.S. also had a pulmonary function testing. (Tr. 658.) His FVC level[23] was 1.77 and FEV1[24] was first measured at 0.85 but then measured at 0.9 on second try. (Tr. 658.)

### C. Staten Island Physician Practice ("SIPP") Records

M.J.S. has been a patient at SIPP since 2010. (Tr. 30.) Dr. Kelly Eberhardt, a pediatrician, has been his doctor since 2011. (Tr. 592.) Over a series of visits from January 16, 2011 to November 13, 2012, Dr. Eberhardt noted M.J.S.'s asthma, ulcerative colitis, and allergies. (Tr. 622.) In March 31, 2011 visit notes, Dr. Eberhardt noted M.J.S.'s history of asthma and stated that "bronchodilators" have been known to be "relieving factors." (Tr. 588.) Dr. Eberhardt described M.J.S.'s coughs as "hacking." (Tr. 589.) On August 31, 2011, based on a "well child" examination of M.J.S., Dr. Eberhardt noted that M.J.S. had been "doing well." On December 22, 2011, Dr. Eberhardt noted based on what is most likely Plaintiff's report, that M.J.S. had been coughing for

---

[23] FVC refers to "Forced Vital Capacity," which is "the largest amount of air that you can forcefully exhale after breathing in as deeply as you can. A lower than normal FVC reading indicates restricted breathing." *See* http://www.mayoclinic.org/tests-procedures/spirometry/ basics/ results/prc-20012673 (Last visited 3/23/2017).

[24] FEV1 refers to "Forced Expiratory Volume," which is "how much air you can force from your lungs in one second. This reading helps your doctor assess the severity of your breathing problems. Lower FEV-1 readings indicate more significant obstruction." *See* http://www.mayoclinic.org/tests-procedures/spirometry/basics/ results/prc-20012673 (Last visited 3/23/2017).

two weeks. (Tr. 599.) Dr. Eberhardt again described the coughs as "hacking." (Tr. 600.) On February 3, 2012, M.J.S. complained of abdominal pain, vomiting, and diarrhea. (Tr. 603.)

On January 16, 2012, and October 12, 2012, Dr. Eberhardt signed forms stating that M.J.S. required assistance with ambulating inside and outside the house, getting up from bed, getting up from a seated position, going to the toilet, dressing, washing, bathing, preparing meals, and feeding himself. (Tr. 320, 325.) In both reports, Dr. Eberhardt noted that full-time home care is needed for M.J.S. (Tr. 320, 325.) In the January 16, 2012 form, Dr. Eberhardt wrote what appears to be the word "child" next to all of the foregoing activities. (Tr. 325.)

### D. Teacher Questionnaire

The record contains an undated Teacher Questionnaire completed by an unnamed teacher. (Tr. 223-26.) In the questionnaire, the teacher noted that M.J.S. had "[n]o problems" in the domains of attending and completing tasks, interacting and relating to others, or moving about and manipulating objects. (Tr. 224-25.) The teacher had known M.J.S. for thirteen days at the time the questionnaire was produced. (Tr. 223.)

## IV. *Consultative Evaluations*

### A. Dr. Kevin McDonough

On September 16, 2011, Dr. Kevin McDonough conducted a consultative examination of M.J.S. (Tr. 277–84.) In his September 17, 2011 report, Dr. McDonough detailed M.J.S.'s medical conditions—including asthma, food allergies, Crohn's disease, and GERD—and the medications that M.J.S. was taking for each condition, and noted M.J.S.'s symptoms as reported by Plaintiff. (Tr. 277–84.) At the time of the exam, M.J.S. was not feeling pain. (Tr. 284.) Dr. McDonough concluded that the exam was "generally unremarkable." (Tr. 284.)

### B.     Dr. S. Imam

On October 3, 2011, State agency pediatric consultant Dr. S. Imam examined M.J.S. and completed a Childhood Disability Evaluation Form.  (Tr. 288–93.)  Dr. Imam noted that M.J.S. had diagnoses of asthma, Crohn's disease, irritable bowel syndrome, right undescended testis, and GERD.  (Tr. 293.)  Dr. Imam also noted that M.J.S. was being treated with medication, and had no hospital admissions and no visits to the emergency room.  (Tr. 293.)  Colonoscopies indicated improvement, and a physical examination was normal.  (Tr. 293.)  Despite finding that M.J.S.'s combination of impairments was severe, Dr. Imam concluded that the combination did not meet, medically equal, or functionally equal any disabilities in the Listings, as required for a disability finding.  (Tr. 288.)  Specifically, Dr. Imam opined that M.J.S. had no limitation in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, or caring for himself.  (Tr. 290–91.)  She also opined that M.J.S. had a less than marked limitation in the domain of health and physical well-being.  (Tr. 291.)

## DISCUSSION

### I.     *District Court's Review of the Administrative Decision*

Unsuccessful claimants for disability benefits under the SSA may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow."  42 U.S.C. §§ 405(g), 1383(c)(3).  In reviewing a final decision of the Commissioner, the Court's duty is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard."  *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Cudworth v. Colvin*, 605 F. App'x 77, 77 (2d Cir. 2015) (summary order) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (alterations and quotation marks omitted)); *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013). In determining whether the Commissioner's findings were based upon substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417. However, "it is up to the agency, and not this court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). Under any circumstances, if there is substantial evidence in the record to support the Commissioner's findings as to any fact, those findings are conclusive and must be upheld. 42 U.S.C. § 405 (g); *see also Cichocki v. Astrue*, 729 F.3d 172, 175–76 (2d Cir. 2013).

## II.     *Disability Standard for Children Under the Social Security Act*

"An individual under the age of 18 shall be considered disabled . . . if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C); *see also Miller v. Comm'r of Soc. Sec.*, 409 F. App'x 384, 386 (2d Cir. 2010) (summary order). In determining whether a child is eligible for SSI disability benefits, a three-step analysis is applied. 20 C.F.R. §§ 416.924(a). First, the ALJ determines whether the child is engaged in substantial gainful activity; if so, the child is deemed not disabled and the inquiry ends. *Id.* §§ 416.924(a), (b). Second, the ALJ determines whether the child has a medical impairment or combination of impairments that is "severe"; if the child is found not to have such an impairment or combination of impairments, she shall be deemed not disabled and the inquiry terminates. *Id.* §§ 416.924(a), (c). Finally, at the third step, the ALJ must determine whether the impairment meets, medically equals, or functionally equals a disability

listed in the SSA's regulatory Listing of Impairments ("Listings"). 20 C.F.R. §§ 416.924(a), (d); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1 (Listings).

The standards for functional equivalence are set forth in 20 C.F.R. § 416.926a, *id.* § 416.924(e), and require that a child have an impairment or combination of impairments that results in "marked" limitations in two, or "extreme" limitations in one, of the following six domains: "(i) Acquiring and using information; (ii) Attending and completing tasks; (iii) Interacting and relating with others; (iv) Moving about and manipulating objects; (v) Caring for yourself; and, (vi) Health and physical well-being," *id.* § 416.926a(a), (b).

A "marked" limitation exists where the impairment "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities." *Id.* § 416.926a(e)(2)(i). A marked limitation is the equivalent of the level of functioning expected where standardized testing shows scores "that are at least two, but less than three, standard deviations below the mean." *Id.* "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with the ability to function (based upon age-appropriate expectations) independently, appropriately, effectively, and on a sustained basis." *Jones v. Astrue*, No. 07-CV-4886, 2010 U.S. Dist. LEXIS 27523, at *16 (E.D.N.Y. Mar. 17, 2010) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(C)).

An "extreme" limitation exists when the impairment "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). An extreme limitation is found where a child's functioning is equivalent to that expected with standardized test scores "that are at least three standard deviations below the mean." *Id.*

### III.    *The ALJ's Decision*

In a written decision dated February 4, 2013, the ALJ denied Plaintiff's SSI claim.  (Tr. 57–72; *see also* Tr. 73–75 (list of exhibits considered).)  The ALJ found that M.J.S. had not been disabled, within the meaning of the Act or its implementing regulations, from the date of the application on July 27, 2011 through the date of the decision.  (Tr. 57.)

Following the three-step analysis set forth in 20 C.F.R. § 416.924, the ALJ found that M.J.S.: (1) had not engaged in substantial gainful activity; (2) had severe impairments of asthma, Crohn's disease, and GERD; but (3) did not have an impairment or combination of impairments that met, medically equaled, or functionally equaled one of the impairments in the Listings.  (Tr. 60-61.)  Specifically, in the third step, the ALJ found that M.J.S. did not have impairments that, alone or in combination, met or medically equaled any of the impairments in the Listings 103.03 (asthma) and 105.06 (Inflammatory bowel disease).  (Tr. 61; *see* 20 C.F.R. Pt. 404, Subpart P, App. 1.)  In determining that M.J.S.'s impairments did not functionally equal a Listing, the ALJ analyzed the six domains of functioning.  (Tr. 65-71.)  He concluded that M.J.S. did not have "marked" limitations in two domains of functioning or an "extreme" limitation in one domain of functioning, and therefore he was not disabled as defined by the SSA.  (Tr. 72.)

The first two steps of the ALJ's decision are not in dispute on appeal, but Plaintiff argues that, on the third step, the ALJ did not correctly apply the relevant legal standards and that his decision was not supported by substantial evidence.  (Pl. Opp. at 4–7.)

## A. The ALJ's Finding that Claimant Has Severe Impairments

The ALJ found that M.J.S. has severe impairments of Crohn's disease, GERD, and asthma. (Tr. 60.)  However, the ALJ found that M.J.S.'s allergic rhinitis[25] and food allergies are not severe impairments and discussed the opinion of the treating pediatrician, Dr. Eberhardt, that M.J.S.'s food allergies "are not a problem if he sticks to liquid and occasional solid foods."  (Tr. 60.)  The ALJ also discussed Dr. Spergel's July 30, 2010 treatment notes and found them to indicate that "the claimant's food condition is controlled, as long as he maintains strict avoidance of certain triggers."  (*Id.*)

## B. The ALJ's Finding that Claimant's Conditions Did Not Meet or Medically Equal One of the Listed Impairments

The ALJ concluded that M.J.S.'s conditions did not meet or medically equal the severity of either listing 103.03 (Asthma) or listing 105.06 (Inflammatory bowel disease).  (Tr. 61.)  With respect to M.J.S.'s asthma, the ALJ noted that M.J.S.'s FVC levels were measured at 1.55, and his FEV1 levels were measured at 1.46, and that because M.J.S.'s height was measured at 111 centimeters, his FEV1 level was not less than or equal to 0.65 and his FVC level was not less than or equal to 0.65.  (*Id.*)  The ALJ also noted that although M.J.S. had received treatment for asthma-related symptoms, those symptoms were precipitated by non-compliance with medication or failure to properly administer medication.  (*Id.*)  Noting that there was no record of M.J.S. receiving inpatient treatment for asthma or of any growth impairment, ALJ concluded that M.J.S.'s asthma did not meet or medically equal the severity of listing 103.03.  (*Id.*)

---

[25] Allergic rhinitis is rhinitis associated with hay fever; allergic rhinitis is manifest by sneezing, rhinorrhea, nasal congestion, pruritus of the nose, ears, palate; may also occur concurrently with allergic conjunctivitis. *Stedman's* at 782280.

With respect to M.J.S.'s Crohn's disease, the ALJ noted that the record did not document any obstruction of stenotic areas in the small intestine, existence of anemia or serum albumin of 3.0 g/dL or less, or a need for supplemental daily enteral nutrition via a gastrostomy or catheter. (*Id.*)  The ALJ also noted Plaintiff's testimony at the hearing that, while M.J.S. experiences daily stomach cramping, he also maintains stability when taking his prescription nutritional formula. (*Id.*)

### C.    The ALJ's Finding that Claimant's Impairment or Combination of Impairments Did Not Functionally Equal the Severity of the Listings

In addition, the ALJ gave some weight to the consultations of Drs. McDonough and Imam. (Tr. 64-65.)  The ALJ noted that Dr. McDonough found the exam of M.J.S. "generally unremarkable."  (Tr. 64.)  The ALJ also noted Dr. Imam's evaluation—that M.J.S. had no limitation in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and caring for himself, and that M.J.S. had a less than marked limitation in the domain of health and physical well-being—but slightly diverged from Dr. Imam's conclusion as to the domain of health and physical well-being.  (Tr. 65.)  The ALJ gave the unsigned Teacher Questionnaire no weight. (Tr. 65.)

As for the six functional domains, the ALJ concluded that M.J.S.'s impairments did not functionally equal the Listings because although M.J.S. had "marked" limitation in the domain of Health and Physical Well-Being, he had no limitation in the other five domains—Acquiring and Using Information, Attending and Completing Tasks, Interacting and Relating with Others, Moving About and Manipulating Objects, and Caring for Himself.  (Tr. 65–71.)

In concluding that M.J.S. had no limitation in the domains of Acquiring and Using Information, Attending and Completing Tasks, and Interacting and Relating with Others, the ALJ

relied on (a) the absence of evidence in the record suggesting any limitation in those domains, (b) Plaintiff's testimony that M.J.S. was "on track" with school and that M.J.S. had no developmental delays, and (c) the absence of any evidence of an Individualized Education Program ("IEP") in the record. (Tr. 65-69.) In determining that M.J.S. had no limitations in the domain of Moving About and Manipulating Objects, the ALJ noted the lack of evidence in the record suggesting any such limitation and the absence of an IEP in the record. (Tr. 69-70.) In support of his finding that M.J.S. had no limitations in Caring for Himself, the ALJ noted that even though there was some evidence of limitations, those appeared to be age-appropriate. (Tr. 70-71.) The ALJ also noted Dr. Imam's finding that M.J.S. had no limitations in this domain. (Tr. 70-71.) For the Health and Physical Well-Being domain, the ALJ found that M.J.S. had marked, but not extreme, limitations citing evidence that M.J.S.'s conditions could be "controlled through medication and avoidance of specific triggers." (Tr. 71.) The ALJ stated that "the clinical and diagnostic testing of record reveals Crohn's disease, but otherwise does not demonstrate any other significant abnormal findings" based on his examination of reports regarding M.J.S.'s colonoscopies, endoscopies, and EGDs performed between 2008 and 2010 (Tr. 62-63.) He also found that M.J.S.'s asthma symptoms were due to medication non-compliance or a failure to properly administer the prescribed medication, or over-exertion. (Tr. 63.) In sum, because M.J.S. did not have "marked" limitations in two domains of functioning or an "extreme" limitation in one domain of functioning, the ALJ concluded that M.J.S. was not disabled as defined by the SSA.

IV.    *The Appeals Council's Decision*

Plaintiff sought review from the Appeals Council and submitted additional medical records. (Tr. 1-5.) Of the documents Plaintiff submitted, the Appeals Council added to the record those related to the relevant time period, *i.e.*, the period on or before the date of the ALJ hearing

decision. (Tr. 2, 5-6.) However, documents relating to M.J.S.'s treatments after the ALJ's February 4, 2013 decision were not considered by the Appeals Council. (Tr. 2.)

**V.** *Analysis*

On appeal, Plaintiff contends that the ALJ's decision was erroneous and not supported by substantial evidence in the record. Specifically, Plaintiff contends that M.J.S.'s asthma meets Listing 103.03 because it meets the requirement set out in Section 103.03(B) of the Listings. Plaintiff also asserts that M.J.S's impairments functionally equaled the severity of the Listings because M.J.S. has marked limitations in other domains, in addition to the Health and Physical Well-Being domain.

### A. The ALJ Did Not Discuss Whether Claimant Met or Equaled Listing 103.03(b)

There are four listed impairments for asthma, two of which are relevant in this case. 20 C.F.R. Pt. 404, Subpart P, App. 1 § 103.03(A), (B), (C), (D). Plaintiff argues that the ALJ's finding that M.J.S.'s asthma condition does not meet or medically equal the requirements for Section 103.03 of the Listing must be reversed because the ALJ only discussed Listing 103.03(A). Plaintiff asserts that M.J.S.'s condition meets or equals the impairment set forth in section 103.03(B) of the Listings.

Section 103.03(A) of the Listings (Asthma) sets maximum FEV (forced expiratory volume) values determined by the claimant's height. 20 C.F.R. Part 404, Subpart P, App. 1 § 103.03(A). The next listed impairment for asthma is Section 103.03(B), which supports a finding of disability when a claimant suffers frequent, severe attacks in spite of prescribed treatment that requires physician intervention. 20 C.F.R. Part 404, Subpart, App. 1 § 103.03(B). The claimant must suffer asthma attacks at least once every two months or at least six times a year. *Id.* "Attacks" are "prolonged symptomatic episodes lasting one or more days and requiring intensive treatment,

such as intravenous bronchodilator or antibiotic administration or prolonged inhalational bronchodilator therapy in a hospital, emergency room or equivalent setting." 20 C.F.R. Part 404 Subpart P, App. I, § 3.00(C). In determining whether a person has suffered the required number of asthma attacks under Section 103.03(B), "[e]ach inpatient hospitalization for longer than 24 hours for control of asthma counts as two attacks, and an evaluation period of at least 12 consecutive months must be used to determine the frequency of attacks."

The Court finds *Lozano ex rel Lozano v. Apfel*, No. 97 Civ. 5925, 2000 WL 1738401 (S.D.N.Y. Nov. 22, 2000) to be instructive. In *Lozano*, the district court remanded a denial of SSI benefits to a child with asthma, finding that there was reason to doubt that the ALJ applied the correct legal standard. *Id.* at * 10. There, the ALJ concluded that although the child had inpatient stays and emergency room visits for respiratory problems, results of pulmonary function studies revealed values above the level required to meet any of the listed impairments. *Id.* at *3. The district court noted that the ALJ's decision did not address whether the child's attacks mentioned in the emergency room records met the definition of an "attack" in Section 103.03(B). *Id.* at *4. Because the ALJ did not discuss the elements of Section 103.03(B) and relied on values from pulmonary function studies, the district court held that there was doubt as to whether the ALJ applied the correct legal principles in determining that the child did not meet or equal the impairment listed under Section 103.03. *Id.* at *4 ("[S]ubparagraphs—§ 103.03(A), (B) and (C)—list disjunctive requirements for finding [impairment for asthma]. . . . the ALJ's statement that the results of pulmonary function studies prevented [the claimant] from meeting any of the listed impairments, without further elaboration, creates doubt as to whether the ALJ applied the correct legal principles").

Similarly, in this case, the ALJ did not discuss whether records of M.J.S.'s urgent care visits or other clinic records demonstrated that M.J.S.'s attacks met the definition as set out in Section 3.00(C).[26] (Tr. 61.) On December 22, 2011, M.J.S. had a cough lasting for two weeks along with congestion. (Tr. 599.) At that time, Dr. Eberhardt diagnosed M.J.S. with asthma exacerbation and prescribed him steroids for five days and Albuterol every four to six hours. (Tr. 600.) On March 31, 2011, Dr. Eberhardt's notes stated, *inter alia*, "The patient's mother describes the cough as hacking. Context known asthmatic. Relieving factors include *bronchodilators*" (Tr. 588 (emphasis added)), suggesting that M.J.S. may have received such a treatment in the past. Moreover, on May 16, 2008, Dr. Spergel noted that M.J.S. "has been treated with oral corticosteroids on monthly occasions, with the most recent course being April 2008." (Tr. 344.) None of these facts were discussed in the ALJ's decision. Although the ALJ discussed two visit records in which the doctor expressed concerns about M.J.S.'s compliance with medication, the ALJ's discussion mainly focused on FVC and FEV1 levels and M.J.S.'s height, making it unclear as to whether Section 103.03(B) was considered at all.

Because of these omissions in the ALJ's decision and because the Appeals Council admitted after that decision additional documents of M.J.S's medical treatments into the administrative record, which Plaintiff asserts further demonstrate that M.J.S.'s condition meets the 103.03(B) Listing, the Court remands and directs the ALJ to address whether M.J.S. meets the requirements under 103.03(B). *See Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)

---

[26] This case is distinguishable from *Lozano ex rel Lozano*, 2000 WL 1738401, in that it may be less clear whether all of M.J.S.'s urgent care and clinic visits related to coughing and respiratory illness would qualify as an "attack" as defined under the SSA. However, as explained *infra*, the Court remands because it is simply unclear from the ALJ's decision whether Listing 103.03(B) was considered, and the ALJ's decision does not discuss relevant portions of the Administrative Record on this issue.

(remanding where ALJ's finding was not sufficiently specific); *see also Boyd ex rel. R.B. v. Colvin*, No. 12–CV–0864, 2013 WL 5345870 (N.D. Tex. Sept. 24, 2013) ("While the determination of whether the evidence in the record meets or medically equals the requirements of the listing is the ALJ's to make, the ALJ's failure to even consider [relevant] evidence in light of the unmentioned subsections of Listing 103.03 suggests that his determination was incomplete."); *Virola v. Barnhart*, No. 02 Civ. 6165, 2003 WL 22990081, at *8 (N.D.N.Y. Dec. 18, 2003) (noting that there are multiple alternate regulatory provisions for which a claimant can meet the listing requirements for asthma).

**B.     Claimant's Impairments May Functionally Equal the Severity of the Listings**

As previously discussed, one or more impairments "functionally equal the listings" if they result in "marked" limitations in two domains or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a).  Because the ALJ found that M.J.S. had "marked" limitation in the health and physical well-being domain (Tr. 71), M.J.S. would be entitled to benefits if ALJ's finding that M.J.S. had "no limitation" in the domains of moving about and manipulating objects, attending and completing tasks, or caring for himself (Tr. 65-71) was unsupported by substantial evidence.[27] *See* 20 C.F.R. § 416.924.

Having reviewed the record, the Court concludes that the ALJ's decision suffers from deficiencies that require a remand.  Specifically, the Court finds that the ALJ has failed to comply with the treating physician rule and also failed to develop the record in determining that M.J.S.

---

[27] Based on Plaintiff's three-page brief, it appears that Plaintiff does not challenge the findings of the ALJ with regards to the first and third domains of functioning, *i.e.*, acquiring and using information and interacting and relating to others.  Plaintiff only argues that M.J.S. has at least marked limitation in moving about and manipulating objects, attending and completing tasks, and caring for himself.

had no limitations in the domains of moving about and manipulating objects, attending and completing tasks, and caring for himself.

1.    The ALJ Failed to Comply with the Treating Physician Rule

"Regardless of its source," Social Security regulations require that "every medical opinion" in the administrative record be evaluated when determining whether a claimant is disabled under the Act.  20 C.F.R. §§ 404.1527(d), 416.927(d).  "Acceptable medical sources" that can provide evidence to establish an impairment include, *inter alia*, Plaintiff's licensed treating physicians and licensed or certified treating psychologists.  *See* 20 C.F.R. §§ 404.1513(a), 416.913(a).

The treating physician rule "generally requires deference to the medical opinion of a claimant's treating physician[.]"  *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).  Social Security regulations require that the ALJ give "controlling weight" to the medical opinion of an applicant's treating physician so long as the opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques and (2) is not inconsistent with the other substantial evidence in [the] case record."  *Lucas v. Barnhart*, 160 F. App'x 69, 71 (2d Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)).  "Treating source" is defined as the claimant's "own physician, psychologist, or other acceptable medical source who provides [a claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]."  20 C.F.R. § 404.1502.  Medically acceptable clinical and laboratory diagnostic techniques include consideration of a "patient's report of complaints, or history, [a]s an essential diagnostic tool."  *Green–Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003) (citation omitted).

It bears emphasis that "not all expert opinions rise to the level of evidence that is sufficiently substantial to undermine the opinion of the treating physician."  *Correale–Englehart v. Astrue*, 687 F. Supp. 2d 396, 427 (S.D.N.Y. 2010) (citing *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008)).  The preference for a treating physician's opinion is generally justified because

"[such] sources are likely to be [from] the medical professionals most able to provide a detailed, longitudinal picture of [the Plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations."  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  The opinion of a consultative physician, "who only examined a Plaintiff once, should not be accorded the same weight as the opinion of [a] Plaintiff's treating [physician]."  *Anderson v. Astrue*, 07 CV 4969, 2009 WL 2824584, at *9 (E.D.N.Y. Aug. 28, 2009) (citing *Spielberg v. Barnhart*, 367 F. Supp. 2d 276, 282–83 (E.D.N.Y. 2005)).  This is because "consultative exams are often brief, are generally performed without the benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day."  *Id.* (quoting *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990)).  In addition, opinions of consulting physicians—whether examining or non-examining— are entitled to relatively little weight where there is strong evidence of disability on the record, or in cases in which the consultant did not have a complete record.  *Correale–Englehart*, 687 F. Supp. 2d at 427.

"An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion."  *Halloran*, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2), now codified at 20 C.F.R. § 404.1527(c)(2)).  If the ALJ did not afford "controlling weight" to opinions from treating physicians, he needs to consider the following factors: (1) "the frequency of examination and the length, nature and extent of the treatment relationship;" (2) "the evidence in support of the opinion;" and (3) "the opinion's consistency with the record as a whole;" and (4) "whether the opinion is from a specialist."  *Clark*, 143 F.3d at 118; *accord Burgess*, 537 F.3d at 128.  Although "[t]he ALJ is not required to explicitly discuss the factors," "it must be clear from the decision that

the proper analysis was undertaken." *Elliott v. Colvin*, 13-CV-2673, 2014 WL 4793452, *15 (E.D.N.Y. Sept. 24, 2014).

Furthermore, when a treating physician's opinions are repudiated, the ALJ must "comprehensively set forth [his or her] reasons for the weight assigned to a treating physician's opinion." *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir.2004) (per curiam); *see Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir.1999); 20 C.F.R. § 404.1527(d)(2) (stating that the Social Security agency "will always give good reasons in [its] notice of determination or decision for the weight [given to a] treating source's opinion" (emphasis added)). "The failure to provide 'good reasons' for not crediting a treating source's opinion is ground for remand." *See Burgin v. Astrue*, 348 F. App'x 646, 648 (2d Cir. 2009) (quoting *Halloran*, 362 F.3d at 33 (stating that the Second Circuit will "not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and . . . will continue remanding when [the Second Circuit] encounter[s] opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.") (changes in original omitted)).

The ALJ incorrectly applied these principles in concluding that M.J.S. has no limitations in five of the functional domains, because the ALJ did not consider Dr. Eberhardt's notes, especially her two forms dated January 16 and October 12, 2012. Courts have found that an ALJ's "failure to acknowledge relevant evidence or to explain its implicit rejection is plain error.'" *Kuleszo v. Barnhart*, 232 F. Supp. 2d 44, 57 (W.D.N.Y. 2002) (quoting *Pagan v. Chater*, 923 F. Supp. 547, 556 (S.D.N.Y. 1996)). Dr. Eberhardt's January 16 and October 12, 2012 forms specifically indicated that M.J.S. has trouble with basic ambulatory functions (Tr. 320, 325). At the hearing before the ALJ, Plaintiff testified that M.J.S.'s primary pediatrician is Dr. Eberhardt, his allergist is Dr. Spergel, and his gastro-entrologist is Dr. Verma. (Tr. 83-84.) Although the

ALJ discussed in his opinion reports of M.J.S.'s colonoscopies, endoscopies, and EGDs performed between 2009 and 2010, many of which were performed by Dr. Verma, and some of Dr. Spergel's notes, the opinion barely discusses Dr. Eberhardt's notes. The only time Dr. Eberhardt's opinions or notes are discussed is in step two, where the ALJ explains his conclusion that M.J.S.'s food allergies are non-severe impairments. (Tr. 60.) The ALJ concluded that M.J.S. had no limitations in moving about and manipulating objects and caring for himself, because there was "no evidence" demonstrating such limitations. (Tr. 69-70.) However, Dr. Eberhardt specifically stated that M.J.S. needs assistance with ambulating, getting out of bed, going to the toilet, and dressing himself, clearly suggesting that M.J.S. may have significant limitations in moving about and manipulating objects and also caring for himself. (Tr. 320, 325.) Indeed, Dr. Eberhardt checked the box indicating that M.J.S. requires "full-time home care." (Tr. 320, 325.) The failure to consider and weigh Dr. Eberhardt's evidence constitutes plain error and warrants remand. *See Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013) (summary order) ("The ALJ is required to consider all available evidence, including . . . statements from . . . the claimant's treating or nontreating source[.]"); *see also Corporan*, 2015 WL 321832, at *5 ("[I]t was an error for the ALJ to omit any mention of [plaintiff's physician's examination] in the [ALJ's] decision.").

By giving some weight to Drs. McDonough and Imam, but not discussing Dr. Eberhardt's opinions, the ALJ not only failed to explain his reasons for the weight he assigned to a treating physician's opinion, *Halloran*, 362 F.3d at 33, but also improperly made his decision by only considering evidence that was consistent with his conclusion. *See Poles v. Colvin*, 14-CV-6622, 2015 WL 6024400, at *4 (W.D.N.Y. Oct. 15, 2015) (finding that because the ALJ did not discuss records that undermined his conclusion, that conclusion was "improperly based on a selective citation to, and mischaracterization of, the record"); *Arias v. Astrue*, 11-CV-1614, 2012 WL

6705873, at *2 (S.D.N.Y. Dec. 21, 2012) ("The ALJ may not simply ignore contradictory evidence. When the record contains testimony tending to contradict the ALJ's conclusion, the ALJ must acknowledge the contradiction and explain why the conflicting testimony is being disregarded."); *Nusraty v. Colvin*, 15-CV-2018, 2016 WL 5477588, *11 (E.D.N.Y. Sept. 29, 2016) (finding that "the ALJ's conclusion that [the treating physician's] opinion is inconsistent with his own notes and with the medical record is not supported by substantial evidence because the ALJ failed to consider the evidence in the record that is consistent with [the treating physician's opinion]"). Because the ALJ concluded that M.J.S. had no limitations in five of the functional domains without discussing at all the opinion of one of M.J.S.'s treating physician, and without explaining why the consultative physician received more weight than the treating physician, the Court finds that ALJ's conclusion "cannot withstand judicial scrutiny." *Bracco v. Comm'r*, 13-CV- 2637, 2015 WL 1475862, at *17 (E.D.N.Y.Mar. 31, 2015).

## 2. The ALJ Failed to Adequately Develop the Record

The ALJ's failure to consider Dr. Eberhardt's notes and her January 16 and October 12, 2012 reports is especially problematic because Dr. Eberhadt was the only treating physician who provided an opinion that remotely touches upon issues related to the six functional domains. (Tr. 320, 325.) None of M.J.S.'s treating physicians submitted a Childhood Disability Evaluation Form or any other report that addresses the domains.

While "[i]t is not the place of the district court to weigh the credibility of complex, contradictory evidence," "it is the place of the district court to ensure that the ALJ has faithfully fulfilled his legal duties," one of which is "to adequately develop the record." *Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 289 (E.D.N.Y. 2004); *see also Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) (where clinical findings were "inadequate," ALJ had a "duty to seek additional information . . . *sua sponte*"). Where "there are gaps in the administrative record," remand to the

Commissioner "for further development of the evidence" is appropriate. *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) (quotation marks omitted); *see also Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) ("[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history . . . ."); *Scott v. Astrue*, No. 09-CV-3999, 2010 U.S. Dist. LEXIS 68913, at *32 (E.D.N.Y. July 9, 2010) ("In light of the ALJ's affirmative duty to develop the administrative record, an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.") (quotation marks omitted); *Hartnett v. Apfel*, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998) ("[I]f an ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly."). Remand is also appropriate where further findings or explanation will clarify the ALJ's reasoning in arriving at the decision on appeal. *See Maragl v. Colvin*, No. 13-CV-2435, 2015 U.S. Dist. LEXIS 99418, at *50–51 (E.D.N.Y. July 29, 2015).

While recognizing that the ALJ secured additional evidence from CHOP and Staten Island Physician Practice (Tr. 176-77), the Court finds that the ALJ failed to adequately develop the record, especially given that Plaintiff was unrepresented in the SSA proceedings (Tr. 78-79). *See Corporan v. Comm'r of Soc. Sec.*, No. 12–CV–6704, 2015 WL 321832 (S.D.N.Y. Jan. 23, 2015) (noting a "well established . . . principle that when a disability claimant is unrepresented, an ALJ's duty to develop the record is 'heightened.'" (citing, *inter alia*, *Cruz v. Sullivan*, 912 F.3d 8, 11 (2d Cir. 1990)).

First, as previously mentioned, none of M.J.S.'s treating physicians submitted a Childhood Disability Evaluation Form or any other report that directly addresses the six domains, which, as

discussed, was a key issue in determining M.J.S.'s eligibility for SSI benefits.[28]  Because none of

M.J.S.'s treating physicians testified at the hearing (Tr. 76-88), the determination was made

without their specific assessments of his capacity as to the six domains.  Moreover, while Dr.

Eberhardt's notations in her January 16, 2012 report indicate that M.J.S. requires full-time home

care, it is not entirely clear what Dr. Eberhardt meant by writing the word "child" next to activities

in which one may have limitations.  The ALJ should have not only considered Dr. Eberhardt's

January 16, 2012 report, but also clarified its content.  *See Correale–Englehart*, 687 F. Supp. 2d

at 428 ("[I]f a physician's report is believed to be insufficiently explained, lacking in support, or

inconsistent with the physician's other reports, the ALJ must seek clarification and additional

information from the physician, as needed, to fill any clear gaps before rejecting the doctor's

opinion.")

Second, in making his determination that M.J.S. had no limitations in many of the domains,

the ALJ relied on the fact that there was no IEP.  (Tr. 65-71.)  However, Dr. McDonough, the

consultative physician, stated in his report that Plaintiff "claimed that [M.J.S.] is not in special ed

but is in a small setting and may have had an IEP done in the past."  (Tr. 284.)  In spite of this

comment by the consultative physician, there was no discussion at the hearing as to whether M.J.S.

has an IEP.  (Tr. 76-88.)  "The ALJ's duty to develop the administrative record encompasses not

only the duty to obtain a claimant's medical records and reports but also the duty to question the

---

[28] The transcript of the December 3, 2012 hearing indicates that Plaintiff did not understand which form Claimant's treating physicians should have filled out.  (*See* Tr. 83 ("[Claimant's treating physicians are] more than willing to give you, [the ALJ] whatever information you need to get the assistance that we need for [M.J.S.;] . . . [the treating physicians] determined . . . , verbally, that [M.J.S.] has [ ] disabilities.  They have—I tried to print out some information online after I received the disc, and I couldn't find anything specific to what they had to fill out and bring . . . [to the hearing.]").

claimant adequately . . . the impact of the claimant's impairments on the claimant's functional capacity." *Brown v. Comm'r of Soc. Sec.*, 709 F. Supp. 2d 248, 256 (S.D.N.Y. 2010).

Third, while the ALJ should have sought further clarification as to Dr. Spergel's August 26, 2011 notes, in which he expressed concern about "compliance" without further elaboration. (Tr. 339.) In Dr. Spergel's earlier, July 30, 2010 notes, he stated the "possibility" of noncompliance and that M.J.S. was not taking his medications correctly as he was not using a spacer. (Tr. 335.) However, in his August 26, 2011 notes, no such explanation was given. (Tr. 339.) Because the ALJ based his decision on the finding that M.J.S.'s continued asthma flare ups were due to "non-compliance or failure to administer the medication properly" (Tr. 339), the Court finds that further documentation and information as to the issue of noncompliance should have been sought to supplement the record. Furthermore, the ALJ did not address Dr. Spergel's assessment that while poor control of M.J.S.'s asthma could be due to the possibility of non-compliance, it also could be due to his GERD, a co-morbid condition.[29] (Tr. 339.)

### 3. Credibility Determination

In assessing Plaintiff's credibility, the ALJ concluded that although M.J.S.'s medically determinable impairments "could reasonably be expected to produce the alleged symptoms,"

---

[29] To the extent that Defendant asserts that the additional evidence Plaintiff submitted to the Appeals Council after the ALJ rendered his decision does not warrant remand, the Court notes that the case is remanded on other grounds as discussed. (Dkt. 15 at 22-23.) Pursuant to the SSA, documents outside of the relevant period were properly excluded from consideration by the Appeals Council. 20 C.F.R. § 416.1470(b) ("[I]f new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision."); *see also Guerra v. Colvin*, 618 F. App'x 23 (2d Cir. 2015) (summary order); *Pollard v. Halter*, 377 F.3d 183, 193 (2d Cir. 2004) (finding that newly submitted evidence must be "relevant to the claimant's condition *during* the time period for which benefits were denied" (emphasis added)). Based on Plaintiff's brief, Plaintiff does not appear to be challenging the Appeals Council's decision not to consider material outside of the relevant period. Therefore, the Court need not address this issue. (*See* Dkt. 11.)

Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not "entirely credible." (Tr. 64.) Specifically, while noting Plaintiff's testimony that M.J.S. experienced weekly gastro-intestinal attacks and daily stomach pain, the ALJ also noted that the only way they affected M.J.S., according to Plaintiff's testimony, was that they affected his routine "as a child . . . and his ability to 'play.'" (Tr. 62.) The ALJ also mentioned Plaintiff's testimony that M.J.S. was on track with school and had no developmental delays. (*Id.*) The ALJ also pointed to a "Request for Accommodations" form, in which Plaintiff stated that M.J.S.'s conditions "should not affect him as long as he is kept away from 'harmful triggers.'" (Tr. 64.) Moreover, although Plaintiff stated in an Asthma Questionnaire that M.J.S.'s attacks increased in 2011, that his medication was ineffective, and that he was experiencing symptoms at "all times of the year," the ALJ observed that the form was completed on August 29, 2011—only three days after Dr. Spergel expressed concern in an August 26, 2011 examination note about M.J.S.'s non-compliance or failure to properly administer the prescribed medication. (Tr. 65.) The ALJ also noted Plaintiff's report in the questionnaire that asthma attacks are sometimes precipitated by over-exertion. (*Id.*) Furthermore, the ALJ observed that M.J.S. never received inpatient treatment or surgery for his conditions and that "[a]lthough . . . [M.J.S.] stay[ed overnight in the hospital] after [he] experienced vomiting, diarrhea, and stomach [pain after] his colonoscopy on July 11, 2011, abdominal X-rays were normal." (Tr. 65.) The Court finds the ALJ's assessment of Plaintiff's credibility is not supported by substantial evidence, in that it disregarded documentary evidence that supported Plaintiff's testimony and selectively focused on evidence that tended to contradict her testimony.

In sum, the Court finds that the ALJ's determination that M.J.S. had no limitations in certain domains was not supported by substantial evidence and was based on a record that should have been further developed.

## CONCLUSION

For the foregoing reasons, the Court DENIES Defendant's motion for judgment on the pleadings, and GRANTS in part and DENIES in part[30] Plaintiff's motion. Pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), the Court reverses the decision of the Commissioner and remands this case for further proceedings consistent with this Order.

Specifically, on remand, the ALJ is to: (1) develop the record especially as to Claimant's impairments in relation to the functional domains; (2) determine whether the opinions of Claimant's treating physicians deserve controlling weight, and if applicable, articulate reasons for according less than controlling weight to these opinions; (3) address whether Claimant's condition meets Listing 103.03(B); and (4) re-evaluate Plaintiff's credibility.

The Clerk of Court is respectfully requested to enter judgment accordingly.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: March 31, 2017
Brooklyn, New York

---

[30] Given its finding that further administrative proceedings are necessary, the Court denies Plaintiff's request for a remand solely to approve and calculate SSI benefits.